Ryan FLEMING, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 09A04–0406–CR–340.

Court of Appeals of Indiana.

Aug. 24, 2005.

---

Jay T. Hirschauer, Cass County Public Defender, Logansport, for Appellant.

Steve Carter, Attorney General of Indiana, George P. Sherman, Deputy Attorney General, Indianapolis, for Appellee.

1. Ind.Code § 35–42–2–1.5.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Ryan Fleming ("Fleming") appeals his conviction following a jury trial for Aggravated Battery,[1] a class B felony.

We affirm.

### ISSUES

1. Whether sufficient evidence supports Fleming's battery conviction.

2. Whether the trial court erred in denying Fleming's motion to dismiss in light of the defense's assertion that the State failed to provide timely discovery of medical records.

### FACTS

Evidence at trial established that on April 6, 2002, Terry Lawson ("Lawson") and his girlfriend Alaine Luckey ("Luckey") visited Lawson's family. They "stopped at the local tavern, [Lawson had] a few drinks, and [they] talked to a lot of people." (Tr. 45). Later that evening, the couple returned home and began preparing for a birthday party they would host there on the following day. While at their home, Lawson had a "few beers." (Tr. 46).

At around 10:30 p.m. that night, Luckey's daughter, Rebecca Wilson ("Rebecca"), arrived at the house accompanied by some visitors, namely: Jason Cart ("Cart"), Sara Chase ("Chase"), Adam Dart ("Dart"), and Ryan Fleming ("Fleming"). Conflicting testimony was presented to the jury regarding whether Rebecca and the visitors had been drinking alcohol during that night. The girls joined Luckey and Lawson in the kitchen to cut fruit for a punch. Later, Lawson moved to the

living room with the boys and they listened to music. Shortly thereafter, Dart and Fleming played their rap music and a heated argument began. Dart testified that Lawson made racial slurs towards Fleming and him. In turn, Fleming screamed at Lawson, "I'm going to kick you[r] a* *, old man." (Tr. 145). After a brief scuffle, Fleming was removed from the house. Luckey locked the door and remained inside with Lawson, while Rebecca and the rest of the visitors got into her two-door car to leave.

With everyone in the car, Rebecca realized that some CDs were on top of it, and Chase opened the door to retrieve them. Instantly, Fleming jumped out of the backseat and rushed towards Lawson, who had come out of the house to smoke. "They started yelling at each other and then [Fleming] started hitting him." (Tr. 106). Fleming "punch[ed] [Lawson] in the face repeatedly" while Lawson had his back against the hood of another parked car. (Tr. 126). "Then [Fleming] got off of him and [Lawson] . . . rolled off the car onto the ground." (Tr. 107). While Lawson lay on the ground, Fleming "started kicking him in the face." *Id.* "[T]hen [Dart] went over and started kicking [Lawson] in the face, too." *Id.* Rebecca testified that she lost count of how many times Lawson was kicked.

"[Lawson] was knocked out." (Tr. 126). He was not "moving when he was on the ground[,] except for when [Fleming and Dart would] kick him." (Tr. 108). With each blow, Lawson's body would "move back a little bit." *Id.* Luckey came out of the house and saw Fleming and Dart beating Lawson. She testified that Lawson was "laying on the gravel, . . . I thought he was dead, . . . he wasn't conscious" and that Lawson's body only moved when "[Fleming] kept kicking him and kicking

him." (Tr. 155). Luckey got in the way, and Fleming and Dart stopped beating Lawson. At Luckey's request, Rebecca gathered the visitors in the car and drove them into town. Luckey and Lawson stayed behind.

Lawson does not remember the actual beating but recalled, "[Fleming] having a hold of me and throwing me down . . . just waking up in the driveway and my girlfriend bawling and telling me my nose was broke of[f] really bad." (Tr. 53). After being punched and kicked, Lawson's face was "bleeding, swollen. . . and his nose was crooked." (Tr. 129). "His nose was shoved to one side like it was just totally broke[n] of[f] his face." (Tr. 156). Lawson testified that he looked as if he had gotten hit "by a truck" and his "nose was completely shoved over here by this cheek." (Tr. 54). Lawson also experienced bruises to his head, arms, and back.

That night, Luckey took Lawson to St. Joseph Hospital in Kokomo, where he was x-rayed, given pain medication, and his nose was moved back into place. A few weeks later a surgical reconstruction of Lawson's nose was performed. Lawson told the jury that two years after the beating, he still had particular difficulty breathing out of the left side of his nose, his sense of smell was diminished, and he showed that his nose was still crooked. According to medical records, Lawson denied losing consciousness the night of the incident. The following day, Lawson and Luckey reported the events to the Cass County Sheriff. Officer Mike Day took their statements and photographs showing Lawson's injuries.

On April 19, 2002, the State charged Fleming with battery resulting in serious bodily injury,[2] a class C felony, and battery

2. I.C. § 35–42–2–1(a)(3).

resulting in bodily injury,[3] a class A misdemeanor. One year and eight months later, on January 29, 2004, a third charge was added for aggravated battery, a class B felony. (Tr. 270). During the criminal proceedings, Fleming filed and was granted two *pro se* motions for a speedy trial. He withdrew the first motion under the advice of counsel. Following Fleming's second motion, the trial date was reset accordingly.

Ultimately, on February 4, 2004, following a two-day trial, a jury found Fleming guilty of both felony charges: battery resulting in serious bodily injury and aggravated battery. As requested by defense counsel, the trial court merged the convictions and entered judgment only on the aggravated battery conviction.

*DECISION*

1. *Sufficiency of the Evidence*

Fleming argues that sufficient evidence does not support his conviction of either felony battery charge. Specifically, he contends that the State did not present expert medical testimony to establish the severity or duration of Lawson's injuries to satisfy the statutory "protracted loss or impairment" element of the aggravated battery statute. Fleming also argues that sufficient evidence does not support the class C felony battery conviction because no serious bodily injury occurred. We disagree.

▇▇▇ Our standard for reviewing questions of sufficiency of evidence is well known. *Spears v. State*, 412 N.E.2d 81, 82 (Ind.Ct.App.1980). Upon a challenge to the sufficiency of the evidence supporting a conviction, a reviewing court will not reweigh the evidence or judge the credibil-

ity of the witnesses, and will respect the jury's "exclusive province to weigh conflicting evidence." *McHenry v. State*, 820 N.E.2d 124, 126 (Ind.2005). While considering only the evidence and reasonable inferences that support the verdict, we must decide whether there is evidence of probative value from which a reasonable trier of fact could infer guilt beyond a reasonable doubt. *Alexander v. State*, 819 N.E.2d 533, 540 (Ind.Ct.App.2004). A mere reasonable inference from the evidence supporting a verdict is enough for us to find evidence to be sufficient. *Herron v. State*, 808 N.E.2d 172, 176 (Ind.Ct.App. 2004), *trans. denied.*

To obtain a battery conviction, the State must prove beyond a reasonable doubt that Fleming knowingly or intentionally touched Lawson in a rude, insolent, or angry manner. I.C. § 35–42–2–1. If such contact resulted in "serious bodily injury," then the crime becomes a class C felony. *Id.* This crime is further elevated to aggravated battery if Fleming inflicted upon Lawson an injury that created a substantial risk of death *or* caused serious permanent disfigurement or the protracted loss or impairment of the function of a bodily member or organ. I.C. § 35–42–2–1.5.

a. *Aggravated Battery*

▇▇▇ Indiana does not have precedent specifically on point as to whether expert witness testimony is required to prove "protracted loss or impairment of the function of a bodily member or organ." However, this court has held that the "substantial risk of death" element of this aggravated battery statute does not require expert testimony. *Wilcher v. State*, 771 N.E.2d 113, 117 (Ind.Ct.App.2002), *trans. denied.*[4] Therefore, consistent with

---

3. I.C. § 35–42–2–1(a)(1).

4. J. Sullivan dissented as to whether enough evidence existed to establish that the injuries

the *Wilcher* precedent, we may interpret this part of the aggravated battery statute as not requiring expert testimony to satisfy the "protracted loss or impairment of the function of a bodily member or organ" element.

Recently in *Neville v. State*, 802 N.E.2d 516, 518 (Ind.Ct.App.2004), *trans. denied*, we recognized that "there is no statutory definition for the word 'protracted.'" Consequently, we turned to the rules of statutory interpretation to determine and give effect to the intent of the legislature. *Id.* Ultimately, we decided to use the plain meaning of "protracted," that is "to draw out or lengthen in time; prolong." *Id.* Following the same logic, we understand the word "impairment" to mean, "[t]he fact or state of being damaged, weakened, or diminished." *Black's Law Dictionary* 754 (7th ed.1999).

In *Neville*, we held that the evidence presented at trial was insufficient to convict a defendant of aggravated battery. There, the State alleged that the victim was shot in the leg, hospitalized for three days, experienced pain, and was discharged from the hospital on crutches. However, we observed that the victim's medical records did not show physicians "document[ed] the severity of [the victim's] injury or note[d] whether he would experience protracted loss or impairment of the function of his leg." *Neville*, 802 N.E.2d at 519. We also noted that the victim "did not testify at trial, so the jury heard no evidence from the victim as to how long he used his crutches, wore his brace, experienced pain, or otherwise suffered loss or impairment of the function of his leg." *Id.* Further, the State did not explain to the jury the nature of the fracture, nor did it

present evidence as to how long the injury caused loss or impairment of the function of the victim's leg. *Id.* Considering those circumstances, we held that the evidence was insufficient to establish the requisite "protracted loss or impairment of the function of a bodily member or organ" for an aggravated battery conviction.

However, we were careful to clarify that the defendant in *Neville* "did not suggest that expert testimony was required," and that such question was not decided. *Id.* at 519 n. 4. "We conclude[d] only that the State presented no evidence of probative value that [the victim] suffered loss or impairment of the function of his leg for longer than three days." *Id.*

The present case is distinguishable from *Neville*, particularly regarding the evidence presented to the jury. First, although no medical expert testified in this case, the medical records introduced as evidence established that Lawson was prescribed pain medication and suffered fractures to nasal bones and his left maxillary sinus. (App.504). A medical report also established that Lawson received "facial trauma with nasoseptal deviation and nasal fracture." (App.523). To correct these injuries Lawson was subjected to surgery for an open reduction of the nasal fracture, septal reconstruction, and a submucous resection of the inferior nasal turbinate. *Id.* During surgery some small bone fragments were removed. *Id.*

Second, the victim in this case, unlike in *Neville*, testified to the extent, experience of pain, and long lasting effects of his injuries. Here, Lawson testified that after two years from the injury,

---

inflicted resulted in "substantial risk of death" because the "State failed to offer any opinion, medical *or otherwise*, indicating that [victim's] injuries created a substantial risk of death. Neither did the State introduce into evidence any of [victim's] medical records." *Id.* at 118, 119 (emphasis added).

I have trouble breathing out of the left side of [my nose] and it closes up a lot more than it ever had before. [ ] I can't breathe out of it like I could before this incident. I have a lot of trouble even blowing my nose. I mean, it sounds weird but I can't really blow my nose right ... I've got to actually hold one side, and I just don't blow it like I used to ... [my nose] doesn't work right ... [I have] a lot of congestion ... constantly, this side will plug up.

(Tr. 59, 60). Lawson testified that he cannot distinguish odors and that his sense of smell is "half as good" as it used to be. (Tr. 61). Lawson also testified that his nose is "still crooked." *Id.* During the trial, the jury was allowed to observe Lawson's nose to ascertain whether it was "still deformed." (Tr. 62). The jury heard Lawson testify that he suffered "a lot of pain" from the corrective surgery. (Tr. 63). He said, "It was probably the most painful thing that's ever happened to me. I mean, I've hurt myself before but nothing that hurt like that." *Id.* Finally, Lawson testified that the injury has also affected him emotionally. When he "look[s] at it every day in the mirror ... it just brings back memories of the pain. I mean, that's something that will probably never heal. I'm constantly reminded of it." (Tr. 64). Further, the jury was provided with photographs of the injuries taken the day after Lawson was beaten which illustrated Lawson's facial injuries and multiple bruises.

■ The fact that medical testimony was not offered at trial will not, as a matter of law, overturn Fleming's conviction on sufficiency of the evidence grounds. "We expect jurors to draw upon their own personal knowledge and experience in assessing credibility and deciding guilt or innocence." *Carter v. State,* 754 N.E.2d 877, 882 (Ind.2001), *cert. denied,* 537 U.S. 831, 123 S.Ct. 135, 154 L.Ed.2d 47. As noted in *Carter,* it is when jurors are presented with evidence that falls outside of the common experience that courts allow a "specialist to supplement the jurors' insight." *Id.* Further, "If scientific, technical, or other specialized knowledge *will assist* the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, *may* testify thereto in the form of an opinion or otherwise." Ind. Evidence Rule 702(a) (emphasis added).

Based upon the evidence presented at trial, we conclude that jurors could have reasonably inferred that Fleming committed battery upon Lawson that caused him "protracted loss or impairment of the function of a bodily member or organ." I.C. § 35–42–2–1.5.

Unlike in *Neville,* where the nature or long-term consequences of the injury were not put before the jury, in this case a jury heard testimony about the severity of Lawson's nose fracture—to the point where it appeared to be "broken off," his ongoing difficulty in breathing or sensing smell, and the pain he suffered from being kicked and punched in the face repeatedly. Further, medical records corroborated testimony about the extent of Lawson's injuries. Therefore, sufficient evidence supports Fleming's conviction of aggravated battery.

### b. Battery Resulting in Serious Bodily Injury

■ Fleming also claims that insufficient evidence supports his conviction for battery resulting in serious bodily injury. "Serious bodily injury" is statutorily defined as

[B]odily injury that creates a substantial risk of death or that causes:

(1) serious permanent disfigurement;

(2) unconsciousness;

(3) extreme pain;

(4) permanent or protracted loss or impairment of the function of a bodily member or organ; or

(5) loss of a fetus.

I.C. § 35–41–1–25.

Here, Fleming does not challenge that a battery occurred. Instead he argues that because Lawson was not unconscious, there was no "serious bodily injury" to elevate the crime from a misdemeanor to a felony. To support his claim, Fleming points to the medical records that report Lawson denied losing consciousness. However, Lawson's argument essentially asks that we ignore other evidence presented to the jurors. For instance, four witnesses testified to Lawson's loss of consciousness resulting from Fleming's battery. Lawson testified that he did not remember what happened after he started to get punched. Luckey told the jury she held Lawson for about "five or ten minutes" trying to wake him up after the beating. (Tr. 157). Rebecca testified that, "[Lawson] wasn't moving when he was on the ground, except for when they'd kick him . . . [then, Lawson's body] would move back a little bit . . . [she thought Lawson] was dead." (Tr. 109). Chase testified, "I was standing there and [Lawson] wasn't moving. We tried to talk to him and he wasn't responding." (Tr. 128).

The foregoing evidence supports the jury's finding that Lawson was rendered unconscious by the battery he suffered. Accordingly, sufficient evidence was presented for the jury to find that serious bodily injury was inflicted upon Lawson.

2. *Timeliness of Medical Record Discovery*

■ Fleming also argues that his conviction should be reversed because the State violated the trial court's discovery order by failing to produce medical records detailing Lawson's injuries and treatment in a timely manner. He emphasizes that the pertinent medical records were only given to the defense on January 5, 2004— one week before the scheduled trial date of January 13, 2004, and one month before the actual trial on February 3, 2004.[5]

■ Ordinarily "absent clear error and resulting prejudice, the trial court's determination of [discovery] violations and sanctions will be affirmed." *Williams v. State*, 714 N.E.2d 644, 649 (Ind.1999), *cert. denied*, 528 U.S. 1170, 120 S.Ct. 1195, 145 L.Ed.2d 1099. When reviewing a challenge to discovery matters, we must give a trial court wide discretionary latitude. *Braswell v. State*, 550 N.E.2d 1280, 1283 (Ind.1990). Since the trial court has a duty to promote the discovery of truth and to guide and control the proceedings, it will be granted deference when assessing what constitutes substantial compliance with discovery orders. *Id.* In cases where there has been a failure to comply with discovery procedures, the trial court is usually in the best position to determine the dictates of fundamental fairness and whether any resulting harm can be eliminated or satisfactorily alleviated. *Id.* If remedial measures are warranted, a continuance is usually the proper remedy. *Id.* Failure to request a continuance, where a continuance may be an appropriate remedy, constitutes a waiver of any alleged error pertaining to noncompliance with the trial court's discovery order. *Warren v. State*, 725 N.E.2d 828, 832 (Ind.2000), (citing *Martin v. State*, 535 N.E.2d 493, 497 (Ind.1989)).

---

**5.** The trial had been set for March 2, 2004 and was rescheduled pursuant to Fleming's second *pro se* speedy trial motion.

 Although it is well established that the negligent destruction or withholding of material evidence by police or prosecution may present grounds for reversal, *Mahrdt v. State*, 629 N.E.2d 244, 248 (Ind. Ct.App.1994), *trans. denied*, before an appellant is entitled to reversal, he must affirmatively show that there was error prejudicial to his substantial rights. *Brown v. State*, 684 N.E.2d 529, 538 (Ind. Ct.App.1997), *cert. denied*, 523 U.S. 1027, 118 S.Ct. 1316, 140 L.Ed.2d 479.

In *Warren*, our Supreme Court reviewed an instance where it was "apparent the State violated the local discovery rules" because the State did not furnish the defense with photographs within the required timeframe. 725 N.E.2d at 832. However, the State had notified the defense of the existence of photographs and other evidence through a "Notice of Discovery Compliance." Therefore, the trial court's decision not to exclude the photographs from evidence was affirmed because the defendant "was aware of [the photographs] existence and could have reviewed them in advance or trial. This is not a case of the State ambushing the defense or failing to disclose discovery items." *Id.*

Here, the formal discovery process began with the issuance of the "Court Order on Discovery and Trial Settings" from the Cass Superior Court, stating in part:

1. The State shall disclose to the defense within thirty (30) days the following material and information within its possession or control: [ ]

(d) Any reports or statements of experts made in connection with the particular case, including results of physical or mental examinations and of scientific tests, experiments or comparisons. [ ]

(f) Any evidence which tends to negate the guilt of the accused as to the offense charged or would tend to mitigate his punishment. [ ]

The State may perform these obligations in any manner mutually agreeable to itself and defense counsel or by notifying defense counsel that material and information, described in general terms, may be inspected, obtained, tested, copied, or photographed, at specified reasonable times and places.

(App.24).

In compliance, the State provided a one-page "After Care Instruction" document from the hospital, but the record here does not reflect any attempt by Fleming or his attorney to request additional medical information. The State filed a "Notice of Discovery" referencing this document twice in open court, first in April of 2002 and then in June of 2003. (App. 19, 29). Absent any mention to the contrary in the record, we infer that the defense received the document. The "After Care Instructions" include the name, address, and telephone number of the hospital were Lawson received medical care following the incident with Fleming. (App. 510). The document states that, in connection with facial injuries, Lawson was examined, evaluated, x-rayed, and prescribed medication. These "After Care Instructions" also document the referral of Lawson to another physician, with the pertinent contact telephone number.

Further, statements contained in the Sheriff's Report,[6] which was provided to the defense on April of 2002 and June of 2003, reveal that Luckey took Lawson to "St. Joseph Hosp. in Kokomo where he was treated … they told him that his nose was broke[n] in [two] places and his left cheek bone was broke[n] …

---

**6.** Cass County Sheriff Department Report # 00002–04–017–000

[Lawson] was released from the hosp[ital] and given a[n] appointment for April 8, 2002 with another doctor."
(App.15).

During the final pretrial conference, on January 29, 2004, defense counsel made a motion to dismiss the case by claiming that the additional medical records tendered by the prosecution on January 5, 2004 were untimely. The following discussion ensued:

Court: The matter in on my calendar for trial on Tuesday, [Defense counsel]. Are you prepared to go to trial on Tuesday?

Counsel: Judge, that's—there's another question there. Am I prepared to go? I personally am. I'm prepared to go to trial on Tuesday ... [a comment about possible contractual payments from the Public Defender's Office was made].

Court: Well, what I think I need to know is that you're prepared to be in court on Tuesday and try the case.

Counsel: I'm not getting paid, Judge. That's the problem.

Court: Well, it's either a yes—the question calls for a yes or no answer.

Counsel: So the answer is no.

Court: So be it. I need to see counsel in chambers for a moment . . . .

[After a brief recess]

Court: Back on the record with regard to the State of Indiana versus Ryan Fleming. Mr. Fleming you're going to go to trial on Tuesday. It's set. I had a consultation in chambers with the Prosecutor and with [Defense Counsel], and I'm assured that the issues with regard to the public defender's contract are being addressed. Otherwise, that's not your concern. That's a separate deal apart from your trial. We're going to trial on Tuesday. The motion to dismiss is denied. There's been—*discovery has been provided and you've had an oppor-*

*tunity to review it, and you should be ready to go to trial,* and we're on the calendar. That's what we're going to do. So we're on trial for Tuesday.
(Tr. 10–12) (emphasis added).

Here, the defense told the trial court it was ready for trial. It did not seek a continuance from the court citing a lack of time to prepare for trial caused by the supplemental discovery, nor did it raise further objections to the trial court's determination. Nothing in the record demonstrates that the prosecution denied or withheld medical documents from the defense or that such documents were otherwise unavailable to Fleming. Further, the record lacks any indication of attempts by the defense to alert the trial court of its need for more medical documents or to compel discovery during any of the multiple pretrial hearings that took place during the year and one half leading up to trial. We find no error or resulting prejudice stemming from the trial court's ruling on this matter.

Accordingly, we affirm Fleming's conviction.

MATHIAS, J., and CRONE, J., concur.