Scott D. WELLS, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 53A01–0405–CR–229.

Court of Appeals of Indiana.

June 15, 2006.

David J. Colman, Elizabeth Ann Cure, Colman & Cure, Bloomington, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, J.T. Whitehead, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

Scott Wells appeals his convictions for Class C misdemeanor operating a vehicle while intoxicated ("OWI") and Class B misdemeanor disorderly conduct. We affirm.

## Issues

We restate and reorder the issues before us as:

I. whether the jury venire represented a fair cross-section of the community of Monroe County;

II. whether the trial court properly denied Wells's motion for a continuance;

III. whether the State committed prosecutorial misconduct during closing argument;

IV. whether the statutes defining the offense of OWI are void for vagueness; and

V. whether Wells's disorderly conduct conviction violates his right to free speech under Article 1, Section 9 of the Indiana Constitution.

## Facts

The following facts reflect the evidence in a light most favorable to the convictions. In 2002, Wells was a Bloomington city councilman. Bud and Amy Bernitt, as well as their acquaintance, Indiana State Police Sergeant J.D. Maxwell, also were involved in local politics, but at the other end of the political spectrum from Wells. On September 27, 2002, Bud called Sergeant Maxwell at his home to inform him that he believed Wells was driving a vehicle while intoxicated. Bud reported that he had seen Wells leave the Crazy Horse bar in Bloomington, then drive erratically to the corner of Sixth and Dunn Streets, where Wells exited his car and urinated in the street.

Sergeant Maxwell called State Police dispatch to see if any troopers were available to investigate Bud's report. After learning that Trooper Stacy Brown was available, Sergeant Maxwell asked the post commander to have Trooper Brown call him at home, which deviated from regular State Police procedure. When Trooper Brown called, Sergeant Maxwell told him Bud's story and asked him to meet the Bernitts in a parking lot near Sixth and Dunn Streets. The Bernitts related what they had seen and gave Trooper Brown a description of Wells and his vehicle, but did not reveal that they knew Wells.

Trooper Brown then left and soon thereafter located Wells's vehicle parked illegally. He called to have the vehicle towed, but Wells got into the vehicle and drove away before a tow truck could arrive. At first, Wells was not wearing his seatbelt, but he put it on after driving by and seeing Trooper Brown's police car. Trooper Brown then pulled behind Wells and saw Wells make a sharp turn around a corner, head to the curb, then overcorrect so that Wells was straddling the center line of the street. Trooper Brown then initiated a stop of the vehicle.

When Trooper Brown approached Wells's vehicle, the window was rolled up and Wells had evident difficulty rolling the window down but finally was able to do so. Trooper Brown asked Wells for his license and registration, and Wells responded by asking repeatedly why he had been stopped, sometimes using profane language. Pursuant to Trooper Brown's training and usual practice, he asks for a license and registration before advising a driver why he or she has been pulled over. Finally, Wells attempted to give his license to Trooper Brown but had difficulty finding and removing it from a stack of cards held together by a rubber band, even though the license was on top of the stack.

Trooper Brown then told Wells that he had been pulled over for not wearing a seatbelt. Wells again responded by being argumentative and using profane language. When Trooper Brown also told Wells of his erratic driving and the report that he had urinated in the street, Wells

called Trooper Brown a "f* * *ing liar." Tr. p. 149.

At this point, Trooper Brown noticed the smell of alcohol on Wells's breath. Trooper Brown also noticed that Wells's eyes were red and watery and that his speech was sometimes slurred and mumbled. Wells also began asking Trooper Brown if he knew who Wells was, and Trooper Brown responded that he did not know and did not care. Wells also asked if Trooper Brown knew Sergeant Maxwell, and when Trooper Brown said he did, Wells began stating that he had been "set up" by Maxwell. *Id.* at 152. Trooper Brown later admitted that he was unhappy with Sergeant Maxwell's actions, but nevertheless believed that the Bernitts' report that Wells was driving while intoxicated was proven to be correct.

Because Wells was being belligerent and highly emotional, and as part of normal protocol for investigating a possible OWI, Trooper Brown called Trooper Travis Coryea for assistance. Before Trooper Coryea arrived on the scene, a nearby resident, Joel Chanvisanuruk, called 911 because Wells was "freaking out." *Id.* at 278. Specifically, Wells was shouting and screaming extensively and appeared to be angry to the extent that Chanvisanuruk was concerned for Trooper Brown's safety and thought he needed backup to help deal with Wells.

When Trooper Coryea arrived, he and Trooper Brown repeatedly asked Wells to get out of his car before Wells finally did so. Wells had difficulty exiting the car; he started to fall backwards in the car when he turned in his seat to exit and had to pull himself up on the steering wheel before getting out, and after getting out he again started to fall backwards before reaching back and steadying himself on the car and closing the door. Wells refused to perform any field sobriety tests and again yelled that he was being embar-

rassed "because of that motherf* * *er J.D. Maxwell...." *Id.* at 160. When Trooper Brown attempted to inform Wells of the implied consent law, Wells repeatedly interrupted him by yelling obscenities and asserting that he had been set up. Throughout Trooper Brown's interaction with Wells, he repeatedly asked Wells to quiet down, but Wells did not do so.

When Wells refused to take a breath test after being read the implied consent law, Trooper Brown decided to place Wells under arrest. After learning this, Wells refused to cooperate with Trooper Brown and Coryea's attempts to handcuff him and place him in a police car. Again, Wells repeatedly yelled obscenities at the troopers in connection with his claim that he had been set up.

On November 7, 2002, the State charged Wells with Class A misdemeanor OWI, Class D felony battery on a law enforcement officer, Class A misdemeanor resisting law enforcement, Class B misdemeanor public intoxication, Class B misdemeanor disorderly conduct, and Class D infraction failure to use a seat belt. The State later amended the information to remove the public intoxication and seat belt charges. Before trial, Wells moved to disqualify the jury panel because it contained no Indiana University–Bloomington students. The trial court denied the motion. On November 12, 2003, a jury found Wells guilty of Class C misdemeanor OWI, a lesser-included offense of Class A misdemeanor OWI, and of disorderly conduct; it acquitted Wells of resisting law enforcement and battery on a police officer. Wells now appeals.

## Analysis

### I. Jury Venire

Wells contends that the jury venire for his trial did not represent a fair cross-section of the Monroe County community, in violation of the Sixth Amendment to the United States Constitution. Specifically,

Wells notes that the jury venire included no students attending Indiana University–Bloomington ("IU"). He also claims that those students comprise almost one-third of Monroe County's census population, or approximately 38,000 out of 120,000 residents.

■■■ "[T]he selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." *Taylor v. Louisiana,* 419 U.S. 522, 528, 95 S.Ct. 692, 697, 42 L.Ed.2d 690 (1975). The jury selection process should operate to reflect a reasonable cross-section of the community from which the venire is drawn. *Wilder v. State,* 813 N.E.2d 788, 791 (Ind.Ct.App.2004), *trans. denied (disapproved of on other grounds by Laux v. State,* 821 N.E.2d 816, 820 n. 4 (Ind. 2005)). There is no requirement, however, that jury panels be a microcosm of a county or a court district. *Id.* "Jurors need not be mathematically proportioned to the character of the community, and there is no requirement that any particular class be represented on every jury." *Id.* The primary requirement is that the selection of a jury venire should not be arbitrary. *Id.*

■■■ In order to establish a prima facie violation of the fair cross-section requirement, the defendant bears the burden of showing: 1) that the group alleged to be excluded is a "distinctive" group in the community; 2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and 3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process. *Id.* If a defendant makes a prima facie showing that he has been denied his right

to have a jury drawn from a fair cross-section of the community, the burden shifts to the State to justify the selection process by showing that attainment of a fair cross-section is incompatible with a significant state interest. *Id.* at 791–92.

Indiana's jury pool selection method is governed by statute. *Azania v. State,* 778 N.E.2d 1253, 1256 (Ind.2002). Indiana Code Section 33–28–4–3(c) allows jury commissioners to use a computerized jury selection system, but requires that the system employed "must be fair and may not violate the rights of persons with respect to the impartial and random selection of prospective jurors." Our supreme court has held that our state jury selection statute, in requiring an "impartial and random selection," demands no less than the Sixth Amendment. *Id.* at 1259.

■■ The manner in which Monroe County selected the jury venire for Wells's case comported with the jury selection statute. It utilized voter registration and property tax records, as required by subsection (a) of Indiana Code Section 33–28–4–3, and supplemented those lists with records of the Bureau of Motor Vehicles, as permitted by subsections (f) and (g) of the same statute.[1] The fact that this selection method resulted in no IU students in Wells's jury pool would seem to indicate that many do not consider themselves to be part of the Monroe County "community" to the extent that they have voted, purchased property, or obtained a driver's license or registered a vehicle in the county. Also, to the extent some IU students have voted, purchased property, or registered with the BMV as a Monroe County resident, there was evidence presented that a large number of jury questionnaires sent to these students are returned by the post office as undeliverable and often no

---

1. Effective July 1, 2006, Indiana Code Section 33–28–4–3 will place sole responsibility for determining lists of prospective voters with the Indiana Supreme Court; there will no longer be a set statutory basis for the source of jury pools. *See* P.L. 80–2006 § 4.

current address for these students can be readily found. This further supports the conclusion that most IU students are not permanent members of the Monroe County "community."

■ We also conclude that Wells has failed to meet his burden of demonstrating that IU students constitute a distinctive group within the Monroe County community for purposes of a fair cross-section analysis. This court has held, " '[B]efore exclusion may be held improper, there must be a common thread running through the excluded group[,] a basic similarity of attitudes, ideas or experience among its members so that the exclusion prevents juries from reflecting a cross-section of the community.' " *Moore v. State*, 427 N.E.2d 1135, 1138 (Ind.Ct.App.1981) (quoting *Adams v. Superior Ct. of San Diego Co.*, 12 Cal.3d 55, 115 Cal.Rptr. 247, 524 P.2d 375, 379 (1974)). Our supreme court previously "has explicitly rejected the contention that persons between eighteen and twenty four years old are a distinctive group" for fair cross-section purposes. *Ewing v. State*, 719 N.E.2d 1221, 1226 (Ind.1999). Most IU students would fall into this age category, but Wells attempts to avoid the holding of cases like *Ewing* by arguing that it is not only the age of the students that is relevant, but also that they "are more diverse in their ethnic, racial, and religious characteristics than the rest of the population" of Monroe County. Appellant's Br. p. 38. This seems to directly contradict the *Moore* requirement of a "distinctive" group within a community sharing common attitudes, ideas, and experiences.

Any conclusion that college students are somehow "different" from other members of the community would have to rely on stereotypical assumptions about them; i.e., that college students as a whole think differently, on average, from other members of society as a whole and on average. We decline to engage in such unsupported speculation. Wells has failed to establish the first prong of the test for establishing a prima facie violation of the fair cross-section requirement.

We also observe, as has the Supreme Court, that most cases finding a violation of the fair cross-section component of the Sixth Amendment or the Equal Protection Clause of the Fourteenth Amendment have involved groups such as African–Americans, women, and Mexican–Americans. *See Lockhart v. McCree*, 476 U.S. 162, 175, 106 S.Ct. 1758, 1766, 90 L.Ed.2d 137 (1986) (citing *Peters v. Kiff*, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972); *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979); *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977)). The Court identified several special concerns in cases where such groups were excluded from jury pools, including that such exclusion was "completely unrelated to the ability of members of the group to serve as jurors in a particular case," the exclusion was on the basis of immutable characteristics such as race, gender, or ethnic background, and that "such exclusion improperly deprived members of these often historically disadvantaged groups of their right as citizens to serve on juries in criminal cases." *Id.* No such concerns are present in this case concerning the exclusion of IU students from Wells's jury pool, which appears to have resulted from the fact that such persons generally are not permanent residents of the Monroe County community and not because of any improper reason.[2]

---

2. Also, unlike a distinctive gender or ethnic group within a community, IU students are not an unchanging groups of persons within the community. Although the total enroll-ment at the university may be relatively constant, the particular identities of the students are constantly changing as graduating or

We perceive no violation of the Sixth Amendment in the selection of Wells's jury venire.

## II. Motion for Continuance

Wells contends the trial court erred in refusing his request for a brief continuance before the commencement of voir dire. The request was made after the State belatedly revealed certain evidence not previously made available to Wells during the normal course of discovery. The evidence consisted of audiotapes of police radio traffic on the night of Wells's arrest, which allegedly might support a conclusion that law enforcement officials wished to "cover up" certain details of the incident.[3] The existence of the tapes was first disclosed on the day before voir dire was set to begin. On the morning of voir dire, counsel for Wells stated that he had not yet received all of the State's transcripts of the tapes, and counsel requested that voir dire be delayed for an hour and a half in order to obtain and review the transcripts. The trial court denied this specific request, but expressed displeasure at the State's late disclosure of the evidence and did agree to delay the presentation of evidence to the jury until Wells had had an opportunity to review the new evidence.

 Wells does not argue that his continuance motion was based upon grounds set forth in Indiana Code Section 35-36-7-1. Rulings on non-statutory motions for continuance are within the sound discretion of the trial court and will be reversed only for an abuse of that discretion and resultant prejudice. *Schmid v. State*, 804 N.E.2d 174, 177 (Ind.Ct.App. 2004), *trans. denied*. An abuse of discretion occurs only if a decision is clearly

against the logic and effect of the facts and circumstances before the court. *Id.*

 Because the continuance in this case was requested following the State's alleged violation of a discovery order, we also note that absent clear error and resulting prejudice, the trial court's determination of discovery violations and sanctions ordinarily will be affirmed. *Fleming v. State*, 833 N.E.2d 84, 91 (Ind. Ct.App.2005). "When reviewing a challenge to discovery matters, we must give a trial court wide discretionary latitude." *Id.* "In cases where there has been a failure to comply with discovery procedures, the trial court is usually in the best position to determine the dictates of fundamental fairness and whether any resulting harm can be eliminated or satisfactorily alleviated." *Id.* A continuance is usually the proper remedy if a discovery violation warrants remedial measures. *Id.* Although the negligent destruction or withholding of material evidence by police or prosecution may present grounds for reversal, an appellant must affirmatively show that there was error prejudicial to his or her substantial rights before reversal is warranted. *Id.* at 92.

Wells does not argue that he was not, in fact, given sufficient time to prepare for the presentation of evidence to the jury after the late disclosure of the audiotapes. Instead, he argues that he was disadvantaged by not fully knowing the contents of the tapes before conducting voir dire of the potential jurors. To address this argument, it will be helpful to review the purpose and regulation of voir dire in Indiana.

 The function of voir dire examination is not to educate jurors. *Perryman v. State*, 830 N.E.2d 1005, 1008 (Ind.

---

transferring students are replaced with new students.

**3.** Wells, however, admits in his brief, "While the evidence did contain some evidence of a

cover-up, in retrospect that issue did not warrant the attention it received, in jury selection, opening statement, and the trial." Appellant's Br. p. 44.

Ct.App.2005). Instead, it is to ascertain whether jurors can render a fair and impartial verdict in accordance with the law and the evidence. *Id.* "Jurors are to be examined to eliminate bias but not to condition them to be receptive to the questioner's position." *Id.* Questions that seek to shape a favorable jury by deliberate exposure to the substantive issues in the case are improper. *Id.*

 At the same time, proper examination may include questions designed to disclose the prospective jurors' attitudes about the type of offense charged in order to allow the parties to intelligently exercise challenges. *Id.* Similarly, the parties may attempt to uncover the prospective jurors' preconceived ideas about a defense the defendant intends to use. *Id.* "To make these determinations, the parties may pose hypothetical questions, provided they do not suggest prejudicial evidence not adduced at trial." *Id.*

 In the present case, it is clear that a central tenet of Wells's defense was that he had been improperly "set up" by local law enforcement and political opponents. This was true practically from the moment Wells was first pulled over by Trooper Brown. Any voir dire conducted by Wells's counsel of prospective jurors could have been tailored to assess their preconceived ideas about the trustworthiness of law enforcement and their potential receptivity to a defense centered on an alleged abuse of police power by political operatives, regardless of whether counsel knew the full contents of the late-appearing audiotapes. Those tapes merely had the potential to enhance claims of abuse of power, not to create an entirely new defense. In any event, Wells's counsel properly would have been precluded from delving into details of his prospective defense dur-

ing voir dire.[4] *See Perryman,* 830 N.E.2d at 1008. Given this, and that the trial court was in the best position to determine the appropriate remedy for the State's discovery violation, we cannot say the court abused its discretion in fashioning a remedy that included delaying the presentation of evidence to the jury, but not delaying the commencement of voir dire. We also find no definitive prejudice to Wells resulting from the discovery violation and the trial court's remedy for it.

### III. Prosecutorial Misconduct

Wells also claims that one of the prosecutors engaged in misconduct during closing argument by stating, "If there had been a slightest bit of credible evidence that Trooper Brown and Coryea conspired with J.D. or Bud Bernitt to arrest the Defendant, I wouldn't have prosecuted this." Tr. pp. 1431–32. Wells immediately objected to this comment. The trial court sustained the objection and directed the jury to disregard the comment. However, the court did not grant Wells's contemporaneous motion for a mistrial.

 Reversal of a conviction based on a claim of prosecutorial misconduct requires a determination that the misconduct had a probable persuasive effect on the jury's decision. *Rodriguez v. State,* 795 N.E.2d 1054, 1058 (Ind.Ct.App.2003), *trans. denied.* When reviewing a properly preserved claim of prosecutorial misconduct, such as Wells's, we first determine whether the prosecutor engaged in misconduct and then consider whether, under all of the circumstances, the prosecutor's misconduct placed the defendant in a position of grave peril to which he or she should not have been subjected. *Id.* "This inquiry depends upon an analysis of the probable persuasive effect any misconduct had on the jury's decision, and whether the al-

4. Wells did not request a transcript of the voir dire for this appeal, so we do not know pre- cisely what questions were asked of the pro- spective jurors.

leged misconduct was repeated such that it appears that the prosecutor engaged in a deliberate attempt to improperly prejudice the defendant." *Id.* at 1059. Additionally, a mistrial is an extreme remedy that is warranted only when less severe sanctions will not satisfactorily correct the error. *Id.* A decision to deny a motion for a mistrial is within the trial court's discretion. *Id.*[5]

■ Wells claims that the prosecutor's statement constituted impermissible vouching prohibited by Section 3.4(e) of the Indiana Code of Professional Responsibility, which states:

> A lawyer shall not ... in trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of the accused....

We agree that under this rule, it was improper for the prosecutor to express his personal opinion as to the merits or justness of the case against Wells.

■ We cannot conclude that Wells suffered grave peril as a result of this conduct. First, the one-sentence comment occurred in the midst of a closing argument by the State that spans over eighty pages in the transcript and that was divided between two attorneys because of its length. Wells points to no other comments made by either prosecutor that would have warranted a mistrial. The statement appears to have been a one-time mistake by the prosecutor, not part of a deliberate and concerted effort to unfairly prejudice Wells.

Second, the trial court immediately recognized and appropriately addressed the statement by directing the jurors to disregard the statement. It also gave final instructions informing the jurors that they were the exclusive judges of the evidence, and that unsworn statements of counsel were not evidence they could consider in reaching their decision. Given the isolated nature of the prosecutor's objectionable comment and the trial court's admonition and instructions to the jury, we cannot say the trial court abused its discretion in denying Wells's motion for a mistrial, nor do we believe reversal of his convictions is required.

### IV. Vagueness of OWI Statutes

■ Next, we address Wells's claim that the statutes defining the offense of Class C misdemeanor OWI are unconstitutionally void for vagueness.[6] Indiana Code

---

5. Wells argues in his brief that the prosecutor's comment amounted to a federal constitutional violation, and we must review whether this violation is harmless beyond a reasonable doubt. He cites for this proposition *United States v. Cotnam*, 88 F.3d 487 (7th Cir.1996), *cert. denied*, 519 U.S. 942, 117 S.Ct. 326, 136 L.Ed.2d 240 (1996). However, the *Cotnam* case concerned prosecutorial argument that infringed upon the defendant's Fifth Amendment right not to testify. The *Cotnam* opinion very clearly delineates that general prosecutorial misconduct claims that do not infringe upon a specific constitutional right are evaluated under a different standard, i.e. generally whether the defendant was deprived of a fair trial because of the alleged misconduct. *See id.* at 497–98. The opinion nowhere states that general prosecutorial misconduct claims are reviewed under the harmless beyond a reasonable doubt standard, but rather quite clearly indicates that they are not. *See id.* at 500 n. 14. Wells's prosecutorial misconduct claim is a general one, not an allegation that a specific constitutional violation occurred. We review his claim under the well-settled Indiana standard recited in *Rodriguez.*

6. Wells states the issue in his brief as whether the OWI statutes "violate the due process guarantees of the Indiana Constitution in the context of this case...." Appellant's Br. p.

Section 9–30–5–2(a) provides, "a person who operates a vehicle while intoxicated commits a Class C misdemeanor." Indiana Code Section 9–13–2–86 defines "intoxicated" as being under the influence of alcohol or another substance "so that there is an impaired condition of thought and action and the loss of normal control of a person's faculties." Wells argues that a person of ordinary intelligence would be unable to determine the conduct prohibited by the statutes because they do not precisely define what amount of alcohol consumption could lead to a finding of impairment under the laws. Wells also contends that the vague nature of the statutes could lead to arbitrary and discriminatory enforcement of the laws.

■ Initially, we note that challenges to the constitutionality of a criminal statute generally must be raised through a motion to dismiss prior to trial, and the failure to do so waives the issue on appeal. *Adams v. State,* 804 N.E.2d 1169, 1172 (Ind.Ct.App.2004). We see no indication in the record that Wells ever filed any such motion with respect to the OWI charge. Although we could consider this issue waived for our review, we choose to address it on the merits.

■ We begin with a "presumption of constitutionality" when the validity of a statute is challenged. *State v. Lombardo,* 738 N.E.2d 653, 655 (Ind.2000). The party challenging the statute bears the burden of rebutting this presumption, and all reasonable doubts must be resolved in favor of the statute's constitutionality. *Id.* "A statute will not be found unconstitutionally vague if individuals of ordinary intelligence would comprehend it adequately to inform them of the proscribed conduct." *Id.* at

656. The statute need only inform the individual of the generally proscribed conduct, and need not list with exactitude each item of conduct prohibited. *Id.* Finally, vagueness challenges to statutes that do not involve First Amendment freedoms must be examined in light of the particular facts of the case at hand. *Id.*

Criminalizing operating a vehicle while intoxicated does not impact any First Amendment freedoms. Thus, we will examine the specific facts of this case to determine whether Wells was put on sufficient notice that the OWI statutes prohibited his conduct. The evidence most favorable to the OWI conviction reveals that Wells was unsteady on his feet and had difficulty exiting his car, had impaired manual dexterity, had bloodshot eyes and slurred or mumbled speech, was loud and belligerent, and smelled of alcohol. These are all clear signs of intoxication. *See Dunkley v. State,* 787 N.E.2d 962, 965 (Ind.Ct.App.2003). A person of ordinary intelligence reasonably should be on notice that driving a vehicle while exhibiting such signs is illegal and prohibited by the OWI statutes. *See Lombardo,* 738 N.E.2d at 656 (holding that person of ordinary intelligence would be on notice that defendant's particular conduct in that case violated the anti-wiretapping statute).

■ Wells contends that because there is not a crystal clear definition of what constitutes "intoxication," persons could never know whether they had reached that threshold before making a decision whether to drive a vehicle. First, we note again that there were clear indications in this case that Wells was intoxicated and should not have been driving. Second, to the

---

30. The Indiana Constitution has no due process clause, but instead has a due course of law provision. *See* Ind. Const. art. 1, § 12. Regardless, Indiana courts have reviewed claims of unconstitutional vagueness in the same manner, whether the defendant invokes the United States Constitution, the Indiana Constitution, or both. *See Bemis v. State,* 652 N.E.2d 89, 92 (Ind.Ct.App.1995).

extent that persons who have been drinking might have some doubt as to whether they are legally "intoxicated," it surely is reasonable to ask such persons to err on the side of caution and not drive.[7] Third, we reiterate that criminal statutes need not be written with the degree of exactitude that Wells seems to be demanding. *See id.*

Wells also seems to contend that the OWI statutes were rendered unconstitutionally vague by 2001 amendments to the statutes. Prior to the 2001 amendments, Indiana Code Section 9–30–5–2 provided for one offense of Class A misdemeanor OWI. Also, Indiana Code Section 9–13–2–86 defined "intoxicated" as "an impaired condition of thought and action and the loss of normal control of a person's faculties to an extent that endangers a person." The 2001 amendments removed "to an extent that endangers a person" from the definition of "intoxication," created the offense of Class C misdemeanor OWI, and provided that OWI is a Class A misdemeanor if the person is so intoxicated that driving a vehicle endangers a person.

We fail to see how the 2001 amendments rendered the OWI statutes unconstitutionally vague. Conviction for Class A misdemeanor OWI still requires prove of intoxication to a degree that operating a vehicle results in endangerment to any person. The creation of the new Class C misde-

meanor OWI offense does not require definitive proof of endangerment, but it still requires proof of impairment. The argument could be made that driving a vehicle while intoxicated always endangers someone. However, it might not always be possible to prove such endangerment beyond a reasonable doubt to a fact-finder's satisfaction, and that clearly was the case here. Regardless of whether there is intoxication to the point of endangerment, persons of reasonable intelligence still are on clear notice that driving while impaired, or while exhibiting signs of impairment such as Wells did here, is illegal. Wells has not met his burden of establishing that the OWI statutes are void for vagueness.

## V. Disorderly Conduct

Finally, we address Wells's argument that his conviction for disorderly conduct violates Article 1, Section 9 of the Indiana Constitution.[8] Article 1, Section 9 states, "No law shall be passed, restraining the free interchange of thought and opinion, or restricting the right to speak, write, or print, on any subject whatever: but for the abuse of that right, every person shall be responsible." The portion of the disorderly conduct statute under which Wells was charged and convicted states, "A person who recklessly, knowingly, or intentionally . . . [m]akes unreasonable noise and continues to do so after being asked to stop

7. Also, to the extent a person might have decreased judgment as to whether they are intoxicated, once they are in fact intoxicated, voluntary intoxication is not a defense to any crime in Indiana. *See Sanchez v. State,* 749 N.E.2d 509, 517 (Ind.2001). Clearly, allowing persons to claim they lacked the faculties to determine whether they were intoxicated because they were intoxicated would vitiate the OWI statutes.

8. Wells frames this issue in his "Statement of the Issues" as whether the trial court improperly refused to instruct the jury regarding the offense of disorderly conduct. However, the

argument section of his brief contains no case law or analysis concerning the proper standard for reviewing the giving or refusal of jury instructions and instead focuses generally on whether his disorderly conviction violates Article 1, Section 9. Thus, that is how we will address this issue. Additionally, Wells refers to the First Amendment to the United States Constitution and "the First Amendment protection for political protest under the Indiana Constitution." Appellant's Br. p. 15. The only cogent argument in the brief, however, concerns Article 1, Section 9 of the Indiana Constitution, and that is the only constitutional provision we will address here.

... commits disorderly conduct...." Ind. Code § 35–45–1–3.

When reviewing whether the State has violated Article 1, Section 9, we first must determine whether state action has restricted a person's expressive activity. *See U.M. v. State,* 827 N.E.2d 1190, 1192 (Ind.Ct.App.2005). There is no question that Wells's conviction for disorderly conduct based on his yelling at Troopers Brown and Coryea satisfies this first requirement.

If, as here, state action has restricted a person's expressive activity, the court then must decide whether the restricted activity constituted an "abuse" of the right to speak. *See id.* In the ordinary case, the reviewing court is typically only required to find the State's determination of an "abuse" to be rational. *See id.* If, however, a claimant is able to show that the expressive activity was "political," the State must demonstrate that it did not "materially burden" the claimant's opportunity to engage in political expression. *Id.* The State does not "materially burden" "political" expression if the restricted speech "inflicted particularized harm analogous to tortious injury on readily identifiable private interests." *Id.* "Evidence of mere annoyance or inconvenience is not sufficient" to justify restricting political speech. *Id.*

The difficult question in this case is whether Wells's tirade following the stop by Trooper Brown constituted political speech. Expressive activity is political if its point is to comment on government action, including criticizing the conduct of an official acting under color of law. *Whittington v. State,* 669 N.E.2d 1363, 1370 (Ind.1996). "In contrast, where an individual's expression focuses on the conduct of a private party—including the speaker himself or herself-it is not political." *Id.* Courts judge the nature of expression by an objective standard, and the burden is

on the claimant to demonstrate that his or her expression would have been understood as political. *Id.* "If the expression, viewed in context, is ambiguous, a reviewing court should find that the claimant has not established that it was political and should evaluate the constitutionality of any state-imposed restriction of the expression under standard rationality review." *Id.*

In *Price v. State,* 622 N.E.2d 954 (Ind. 1993), our supreme court first set forth the special protection afforded political speech under Article 1, Section 9 of the Indiana Constitution and reversed the disorderly conduct conviction of a defendant who had yelled loudly and profanely at police officers. Initially, the defendant was yelling with respect to the officers' treatment of a third party whom they had arrested, but after her own arrest the defendant began yelling, "F* * * you. I haven't done anything." Noting that it was clear that the defendant's tirade "was a protest about the legality and appropriateness of police conduct," our supreme court concluded that the defendant's expressive activity was political speech and stated, "When a citizen's protest is occasioned by the conduct of government actors and regards a matter of public concern, it is squarely within the public pale." *Price,* 622 N.E.2d at 961.

*Price,* by itself, might support the conclusion that Wells's tirade, in part directed toward Troopers Brown and Coryea and indirectly toward Sergeant Maxwell, was political speech. In fact, our supreme court later clarified that portions of the Price defendant's tirade were not political in *Whittington v. State,* 669 N.E.2d 1363 (Ind.1996). Chief Justice Shepard, who also authored *Price,* wrote for the majority, "where an individual's expression focuses on the conduct of a private party—including the speaker himself or herself—it is not political." *Id.* at 1370. He noted that in *Price,* the defendant was protesting

police treatment of another citizen before being warned to be quiet, at which time her expression shifted to a defense of her own conduct. *Id.* The Chief Justice then concluded, "It was the State's reliance on Price's *pre-warning political expression* to prove an essential element of the offense that was fatal to the conviction." *Id.* (emphasis added). Additionally, Whittington clarified that a defendant has the burden of establishing that particular speech is political, and if there is ambiguity about the nature of certain speech, courts should err on the side of concluding that it is not political. *Id.*

The particular facts of *Whittington* were that the defendant loudly protested police investigation of a domestic complaint, which led to his arrest and conviction for disorderly conduct. The majority had "little difficulty concluding that his expression was not political" where the defendant merely was protesting that he had not done anything and that the other witnesses were lying. *Id.* at 1370–71. Later, in *Johnson v. State,* 719 N.E.2d 445 (Ind. Ct.App.1999), this court addressed the defendant's disorderly conduct delinquency adjudication after he loudly protested that he was not going to adhere to his probation conditions. We concluded that the statements were at best ambiguous and, therefore, not political. *Id.* at 449. We reasoned,

> Although it is not implausible that Johnson was criticizing the State for imposing unfair probation conditions, it is equally plausible that Johnson was simply commenting on his own conduct and intentions. Johnson merely stated that he was not going to attend the required classes. This comment could be construed to reflect nothing more than Johnson's opinion that he can do what he wants, when he wants.
>
> *Id.*

Additionally, in *Shoultz v. State,* 735 N.E.2d 818, 827 (Ind.Ct.App.2000), *trans. denied,* we held that words directed at a policeman about the treatment of another person were political speech. We acknowledged, however, that a "speaker's defense of his or her own conduct to a police officer is not political. . . ." *Shoultz,* 735 N.E.2d at 826. What invalidated the disorderly conduct conviction in that case was that it was based in part on the defendant's protests regarding a police officer's alleged "hassling" of a fellow motorcyclist, not solely upon any later attempt by the defendant to protest his innocence. *Id.* at 827. Similarly, in the *U.M.* case, what was held to be political speech was the defendant's complaints to a police officer regarding his forcing one of the defendant's companions to keep his arms up. *See U.M.,* 827 N.E.2d at 1193. There was no indication that the disorderly conviction was based solely on the defendant's protestations of his own innocence; as we noted, "U.M. was expressing himself regarding the legality and appropriateness of police conduct *toward his companion.*" *Id.* (emphasis added).

Here, Wells was not protesting police treatment of a third party. He was angry that an officer had stopped him for a relatively minor seat belt violation. Wells also was quick to inform the officer that, because of local political machinations, he believed he had been "set up." [9] However,

---

9. There might have been more than a grain of truth to these allegations. However, subjective reasons for initiating a traffic stop are irrelevant so long as there is objective, reasonable suspicion that a driver has violated some provision of the traffic code. *See Mitch-ell v. State,* 745 N.E.2d 775, 787 (Ind.2001). Wells has challenged neither the legality of his initial stop nor the ensuing investigation into whether he was operating while intoxicated.

no one forced Wells to drive after he had consumed alcohol, and it was his failure to fasten his seat belt that occasioned the stop.

Wells's loud diatribe was only about himself and his predicament. Although we now know that Wells's political adversaries had called his situation to the attention of law enforcement, Wells did not know that with certainty at the time of his tête-à-tête with Trooper Brown. Moreover, Wells was not "set up" in the sense of having evidence against him fabricated; he actually did commit the infraction of driving without a fastened seat belt and the crime of operating a vehicle while intoxicated.

We conclude that at best, Wells's speech in this situation was ambiguous as to whether it was political speech. Thus, we must err on the side of concluding that it was not political. See *Whittington*, 669 N.E.2d at 1370. In one sense, Wells's speech could be seen as "political" because he was alleging impropriety in the conduct of certain public officials. On the other hand, the speech reasonably can be viewed simply as an attempt by Wells to "talk his way out of" a ticket or further investigation by the police into whether he was operating while intoxicated. Wells was not coming to the defense of a third party whom he believed was being treated unfairly by the police or other public officials. Under *Whittington* and *Johnson*, such speech is not political.

Having concluded that Wells's speech was not political, the constitutionality of his conviction for disorderly conduct is evaluated "under standard rationality review." *Id.* A conviction for disorderly conduct that does not involve political speech is constitutional if it is reasonable to conclude that the defendant's expressive activity "was an 'abuse' of the right to speak or was, in other words, a threat to peace, safety, and well-being." *Id.* at 1371. Here, there is no doubt that Wells's dia-

tribe met this standard. The loudness and anger of his diatribe compelled a nearby resident, Chanvisanuruk, to call 911 because Wells was disturbing his ability to complete a school assignment and because he feared for the safety of Trooper Brown. Clearly, Wells's speech posed a threat to peace, safety, and well-being. Wells's conviction for disorderly conduct does not violate Article 1, Section 9 of the Indiana Constitution.

## Conclusion

Wells has failed to demonstrate reversible error regarding the conduct of his trial in his claims regarding the jury venire, denial of his motion for a continuance, and prosecutorial misconduct. He also has not established that the OWI statutes are void for vagueness. Finally, we conclude that his conviction for disorderly conduct does not violate the free speech provision of the Indiana Constitution. We affirm.

Affirmed.

SHARPNACK, J., concurs.

RILEY, J., concurs in part and dissents in part with separate opinion.

RILEY, Judge concurring in part and dissenting in part.

I concur with Parts I, II, III, and IV. I respectfully dissent to Part V and would vacate Wells' conviction for disorderly conduct. Unlike the majority, I conclude that in protesting his stop and arrest, Wells engaged in protected political speech.

Our supreme court has explained that Article I, Section 9 of the Indiana Constitution contemplates a broad notion of expressive activity, extending to all subjects and every conceivable mode of expression, including the projection of any words in any manner. *Whittington v. State*, 669 N.E.2d 1363, 1368 (Ind.1996). In addition, this court has previously held that the

language of Section 9 "affirms the rights of expression in language much more comprehensive than the First Amendment." *Mishler v. MAC Systems, Inc.*, 771 N.E.2d 92, 97 (Ind.Ct.App.2002). Thus, given the expansive language and reading of Section 9, there is no question that Wells was engaged in expressive activity, and that the state's action, convicting Wells of disorderly conduct, in effect restricted that expressive activity. *See Madden v. State,* 786 N.E.2d 1152, 1156 (Ind.Ct.App.2003), *trans. denied.*

While I agree that not all political expression is shielded from criminal liability, I disagree with the majority's distinction in the present case between political speech pertaining to government misconduct toward a third party and such misconduct pertaining to one's own self. *See id.* at 1157. My reading of *Price v. State* leads me to conclude that Price engaged in political speech when she objected to the arrest of a third party, as well as when she objected to her own arrest. *Price v. State,* 622 N.E.2d 954, 964–65 (Ind.1993), *reh'g denied.* Among Price's statements to the police officer were, "F— you," and "I haven't done anything." *Id.* at 957. The *Price* court concluded that this expressive activity was political speech because Price was protesting the legality and appropriateness of police conduct. Likewise, my reading of the recent case, *U.M. v. State,* is that U.M. was not just protesting the police officers' treatment of his friend, but also protesting the general conduct of the officers. Among U.M.'s statements were, "You guys are all racists," and "f— the police." *U.M. v. State,* 827 N.E.2d 1190, 1191 (Ind.Ct.App.2005). Albeit reluctantly, based on the precedent of *Price,* we ultimately concluded that U.M. was engaged in expressive activity that targeted the conduct of a government actor, the police. *Id.* at 1193.

Similar to *Price* and *U.M.,* I find that the thrust of Wells' speech was to comment on actions by government actors, specifically the arresting police officers' possible involvement in a set-up by other government officials. Accordingly, I would hold that the restriction on Wells' criticism of the officers imposed a material burden on his fundamental right to free speech. *See id.* at 1192. Even though, as the *Price* court also noted in that case, Wells' conduct may have been sufficient to support a conviction for public nuisance, in light of the boundaries imposed on our disorderly conduct statute by the Indiana Constitution's protection for freedom of expression, I conclude that Wells was improperly convicted of disorderly conduct.