## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 27 2018, 8:58 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ana M. Quirk
Muncie, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caryn N. Szyper
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

William O. Jackson,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

March 27, 2018

Court of Appeals Case No.
18A05-1709-CR-2166

Appeal from the
Delaware Circuit Court

The Honorable
Thomas A. Cannon, Jr., Judge

Trial Court Cause No.
18C05-1605-F2-5

**Kirsch, Judge.**

[1]     William O. Jackson ("Jackson") appeals his convictions following a jury trial for Level 3 felony aggravated battery[1] and Level 2 felony aiding, inducing, or causing another person to deal a narcotic drug.[2]  On appeal, Jackson raises the following consolidated and restated issues:

> I.  Whether there was sufficient evidence to support his conviction for Level 3 felony aggravated battery; and

> II.  Whether there was sufficient evidence to support his conviction for Level 2 felony aiding, inducing, or causing another person to deal a narcotic drug.

[2]     We affirm.

## Facts and Procedural History

[3]     In the early morning hours of May 6, 2016, Jackson and James Tabb ("Tabb") drove a passenger van from Muncie, Indiana, to Chicago, Illinois, to pick up George Neloms ("Neloms").  Neloms, who had known Tabb for about thirty years and Jackson for about a year, was moving to Muncie.  In fact, he had previously moved his belongings to Muncie and was storing them in Jackson's residence.

[4]     Jackson and Tabb picked up Neloms around 7:00 a.m., and the three went to buy drugs.  Tabb got out of the van and bought heroin from a dealer with "curb

---

[1] *See* Ind. Code § 35-42-2-1.5.

[2] *See* Ind. Code §§ 35-48-4-1(a)(1), (e)(1), 35-41-2-4.

service."[3] *Tr. Vol. II* at 102. The transaction was visible to Jackson and Neloms, who stayed inside the van. When Tabb got back into the van, he poured some heroin onto a saucer, crushed it, and the three men snorted the heroin. On the drive back to Muncie, Tabb stopped at a gas station, where the men got gas and snacks and, again, snorted heroin. Jackson then drove the van the rest of the way to Muncie.

[5] In May 2016, Michele Knight ("Knight"), a Muncie native, was acquainted with Tabb and bought drugs from him about five times a week. During the May 6 road trip, Knight called Tabb repeatedly to find out when the drugs would arrive in Muncie, saying that she wanted $100 worth of heroin. At one point, Jackson spoke with Knight and told her, "I'm on my way."[4] *State's Ex.* 110 at 14:57-15:06. The three men arrived in Muncie mid-afternoon of May 6, and Jackson drove the van straight to Knight's residence, which was near a motel parking lot in Delaware County, Indiana. Knight entered the van, gave money to Jackson, and Jackson handed her some heroin. *State's Ex.* 110 at 15:15-15:35. After Knight exited the van, others in the parking lot entered the van one at a time to buy their heroin.

---

[3] At trial, George Neloms testified, "[T]hey got spots [in Chicago], it's different than here it's like curb service, you get out the truck, you asked how many you want, you have your money out and unfolded, one guy search you, another guy bring you the stuff, you get it, you take off." *Tr. Vol. II* at 102.

[4] Although Knight and Neloms testified at trial that Knight only called Tabb during the trip to Muncie, *Tr. Vol. II* at 85-86, 145-46, Jackson admitted during a recorded police interview, which was admitted at trial, that Knight also spoke to him about buying drugs. *State's. Ex.* 110 at 3:35-4:15, 15:00-16:00.

[6] Knight had previously informed Muncie Police Department ("MPD") Officer Tyler Swain ("Officer Swain") that a shipment of heroin was coming into Muncie from Chicago on May 6; however, she did not provide information as to who was bringing the drugs or when. Officer Swain recruited other officers to aid in the surveillance of Knight's residence, including MPD Officers Keith Benbow ("Officer Benbow"), Richard Howell ("Officer Howell"), and Bret Elam ("Officer Elam"). Unbeknownst to Jackson and his two companions, Knight's residence was under surveillance by the MPD Narcotics Unit when Jackson pulled Tabb's van into the parking lot.

[7] Officer Elam was watching Knight's residence from a parking lot across the street when he saw the van stop near Knight's residence and observed Tabb exit the van. Officer Elam recognized Tabb because the Narcotics Unit had been investigating him for several months and had previously conducted controlled-buy operations with Tabb as the target. Officer Elam saw various individuals go in and out of the van. About ten minutes later, the van left the parking lot. Officer Elam alerted the other officers who were on their way to the scene that the van was on the move. On May 6, Officer Howell, a canine handler, was the only one of the four officers who was in uniform and driving a marked police vehicle. The other three officers were working undercover.

[8] Officers Benbow, Howell, and Swain, each driving separate vehicles, drove toward the van's expected route and converged on the van around the same time. Officer Howell followed the van, turned on his emergency lights, and pulled the van to the side of the road. With his weapon drawn, Officer Howell

exited his police vehicle and called to the occupants of the van to "show their hands." *Tr. Vol. II* at 161. Before Officer Howell could reach the driver's door, and without warning, the van moved forward, prompting Officer Howell to return to his cruiser and activate the siren. The van moved twenty to thirty yards and stopped. Officer Howell again exited his car with his weapon drawn. Reaching the driver side door, he ordered the occupants to show their hands. Officer Howell could see Jackson and Tabb in the front seat, but because the back windows were tinted, Officer Howell had to open the driver side door to see Neloms. While Officer Howell was still ordering the men to show their hands and get out of the van, Jackson suddenly put the van into drive and sped away at a "high rate of speed." *Id.* at 163. Officer Howell returned to his vehicle and pursued the van.

[9] Before the van sped off, and while Officer Howell was dealing with Jackson, Officers Benbow and Swain had exited their vehicles, and both had moved toward the passenger side of the van. Officer Benbow was near the front passenger-side window, and Officer Swain was near the back passenger-side window. The undercover officers could see three men in the van; however, the tinted back windows obscured some of their view. Officers Benbow and Swain ordered Tabb and Neloms to keep their hands in the air, which they did. While Officer Benbow was watching Tabb, Officer Swain saw a "furtive" movement" in the back seat. *Tr. Vol. III* at 14. Thinking Neloms might be reaching for a gun, Officer Swain tried to open the back door, but it was locked. Officer Swain's attempt to enter the van caught Neloms's attention, and Neloms again

reached down. Concerned for his safety, and wanting to unlock the van door to get a visual on what Neloms was reaching for, Officer Swain stepped up on the van's running boards and tried, without success, to break the back-passenger window with the butt of his gun. Still on the running boards and yelling, "let me see your hands," Officer Swain felt a "giant jerk and the van ha[d] just completely taken off." *Id*. at 16. Seeing the van moving, Officers Howell and Benbow sprinted back to their cars and pursued the van.

[10] Not able to get Jackson's attention, Officer Swain moved along the running boards to the front passenger-side window. Officer Swain was clinging to the outside of the van with his left hand, banging on the front window with his gun in his right hand, and calling to Jackson to stop the van. Jackson looked straight at Officer Swain and, ignoring his pleas to stop, continued to accelerate down the road. *Id.* at 17-18. Officer Swain then pointed his gun at Jackson through the closed front passenger-side window and again yelled "please stop I'll shoot, I'll shoot, I'll shoot, please stop." *Id*. at 18. When Jackson continued to drive faster, Officer Swain fired multiple shots at Jackson, breaking the front passenger-side window and hitting Jackson in the arm. This caused the van to swerve, throwing Officer Swain off the van, as it continued down the road. Officer Swain hit his head on the pavement and "kinda blacked out" as he slid across the road and landed in a yard near a large tree. *Id*. at 19-20.

[11] Officers Howell and Benbow, still following behind the van, stopped to see if Officer Swain needed help. Officer Swain motioned for them to continue pursuing the van, which they did. As Officer Benbow continued his pursuit, he

found Neloms lying on the ground at an intersection with three bags of heroin nearby. The Indiana State Police Lab determined that these three bags contained "adulterated heroin weighing 29.71 [grams]." *State's Ex.* 108; *Tr. Vol. II* at 16. Neloms had jumped out of the van just before Jackson and Tabb abandoned it in the middle of the street. Officer Howell saw Tabb running from the van and, with the help of his police dog and Officer Elam, he apprehended Tabb. Afterward, Officer Howell followed a blood trail from the driver's seat of the van and found Jackson by the side of a house. Jackson, Tabb, and Neloms were arrested and then taken to the hospital.

[12] Officer Swain was transported to the emergency room of Ball Memorial Hospital. There, he was examined by Dr. Joseph Indiano ("Dr. Indiano"). A forensic nurse photographed, measured, and diagramed each of Officer Swain's visible wounds. Officer Swain testified that he felt pain from the road rash, he felt like something popped out of his shoulder, his head was "killing" him, and he was going in and out of consciousness on the way to the hospital. *Tr. Vol III* at 19-20. In his recorded deposition, Dr. Indiano testified that Officer Swain suffered a broken collar bone, abrasions over much of his body, and had a bump on his head. Dr. Indiano testified that Officer Swain's broken collar bone resulted in a protracted loss or impairment of the function of his arm.

[13] Officer Swain testified that he was in a brace and a sling for eight weeks because of his broken collar bone, and it was uncomfortable to lay down so he had to sleep in a recliner for weeks. *Id.* at 25. Officer Swain said he could not lift

anything or use his arm at all during that time, and he could not work for about eleven weeks.

[14] The State charged Jackson with Count 1, Level 2 felony aiding, inducing, or causing another person to deal a narcotic drug, and Count 2, Level 3 felony aggravated battery.[5] The State also filed its Notice of Intent to Seek Habitual Offender status. In July 2017, the trial court held a bifurcated trial, and in phase one, the State presented evidence on Counts 1 and 2. At the close of the evidence, the jury instructions included: (1) Instruction 18, which set forth guidance for the jury's determination of whether Jackson was guilty of aiding, inducing, or causing Tabb to deal a narcotic drug; and (2) Instruction 19, which instructed the jury that an intervening cause can break the chain of criminal responsibility. After deliberation, the jury found Jackson guilty of aggravated battery and aiding, inducing, or causing another person to deal a narcotic drug. Jackson was found to be a habitual offender in phase two. Jackson now appeals.

## Discussion and Decision

[15] Jackson contends that neither of his convictions was supported by sufficient evidence. For sufficiency challenges, we do not reweigh the evidence or judge witness credibility. *Gibson v. State*, 51 N.E.3d 204, 210 (Ind. 2016), *cert. denied*,

---

[5] The State also charged Jackson with Count 3, Level 5 felony aiding, inducing, or causing another person to deal in a narcotic drug; Count 4, Level 5 felony resisting law enforcement; Count 5, Level 6 felony criminal recklessness; Count 6, Class B misdemeanor possession of marijuana; and notice of intent to seek enhanced penalty based upon prior conviction. Prior to trial, those charges were dismissed on the State's motion.

137 S. Ct. 1082 (2017). We consider only the evidence most favorable to the judgment together with all reasonable inferences that may be drawn from the evidence. *Id.* We will affirm the judgment if substantial evidence supports it, even if the evidence is conflicting. *Id.* Reversal is appropriate only when "'no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt.'" *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007) (quoting *Jenkins v. State*, 726 N.E.2d 268, 270 (Ind. 2000)). Thus, the evidence is not required to overcome every reasonable hypothesis of innocence and is sufficient if an inference may reasonably be drawn from it to support the verdict. *Id.* at 147.

## I. Level 3 Felony Aggravated Battery

[16] To convict Jackson of Level 3 felony aggravated battery, the State had to prove that he knowingly or intentionally inflicted injury on Officer Swain and that the injury created a substantial risk of death or caused: (1) serious permanent disfigurement; or (2) protracted loss or impairment of the function of a bodily member or organ. Ind. Code § 35-42-2-1.5. "'Protracted' means 'to draw out or lengthen in time' and 'impairment' means 'fact or state of being damaged, weakened, or diminished.'" *Mann v. State*, 895 N.E.2d 119, 121 (Ind. Ct. App. 2008) (citing *Neville v. State*, 802 N.E.2d 516, 518 (Ind. Ct. App. 2004), *trans. denied*, and *Fleming v. State*, 833 N.E.2d 84, 89 (Ind. Ct. App. 2005)). "[E]xpert testimony is not required to prove the victim suffered a protracted impairment." *Id*.

[17] Jackson asserts two reasons why the evidence did not support his conviction for aggravated battery. First, he contends that Officer Swain's injuries did not create a substantial risk of death, cause serious permanent disfigurement, or cause a protracted loss or impairment of a function of a bodily member or organ. *Appellant's Br.* at 23. Second, Jackson contends that Officer Swain's actions were an intervening cause that broke the connection between Jackson's actions and Officer Swain's injuries. *Id.* We discuss these arguments in turn.

### A. Sufficient Evidence of Protracted Injury

[18] Jackson states that Officer Swain "tumbled off" of the van, "bumped his head," "suffered road rash," and "broke his collar bone." *Appellant's Br.* at 22. Jackson contends that Officer Swain's injuries did not show a substantial risk of death or a protracted loss or impairment of a function of a bodily member or organ because medical personnel "cleaned up" Officer Swain's legs and arms, noted he had a bump on his head, but did not admit him to the hospital. *Id.* at 23. Furthermore, Officer Swain did not need physical therapy. *Id.*

[19] The evidence most favorable to the guilty verdict, however, showed that Officer Swain was thrown from the running boards of the van while the van was moving at a high rate of speed. *Tr. Vol. II* at 163, 164. Officer Swain was in and out of consciousness in the ambulance on the way to the hospital and had shoulder pain. *Tr. Vol. III* at 19-20. In his recorded deposition, which was introduced at trial, Dr. Indiano said that Officer Swain suffered a broken collar bone; had abrasions on his upper torso, shoulders, back, elbows, hands, and arms; and a had a bump on his head, which was the size of half a ping pong

ball. *State's Ex.* 152 at 5:40-7:00; *State's Exs.* 76-105. Dr. Indiano testified that Officer Swain's broken collar bone resulted in a protracted loss or impairment of the function of a bodily member. *State's Ex.* 152 at 8:50-10:00. Specifically, he said that, since the fracture prevented stabilization of Officer Swain's shoulder, the use of Officer Swain's right arm would have been substantially impaired, and it would have been difficult for Officer Swain to use the arm for at least ten to twelve weeks. *Id.* at 8:50-11:30. Dr. Indiano opined that treatment for the broken collar bone would have required Officer Swain to have his arm in a sling for at least six weeks and, since his muscles would likely atrophy, he would require four to six weeks of rehabilitation thereafter. *Id.*

[20] Officer Swain testified that he was in a brace and a sling for eight weeks because of his broken collar bone. *Tr. Vol. III* at 25. He testified that it was uncomfortable to lay down so he had to sleep in a recliner for weeks. *Id.* During that time, Officer Swain could use his hand somewhat, but he could not lift anything or use his arm at all. *Id.* at 26. Even after the brace and sling were removed, Officer Swain's arm was sore and weak, and he had to do physical therapy on his own. *Id.* Officer Swain was not cleared to return to work for "a few more weeks" after the brace was removed. *Id.*

[21] The evidence most favorable to the verdict—that Officer Swain broke his collar bone, had to have his arm in a brace and sling for eight weeks, was unable to use his hand and arm during that time, was out of work for about eleven weeks, and was deemed by Dr. Indiano to have sustained a protracted loss or impairment of the function of his shoulder and hand—was sufficient to support

Jackson's conviction for Level 3 felony aggravated battery. *See Mann*, 895 N.E.2d at 122 (victim's testimony that he suffered muffled hearing two months after the attack was sufficient to establish that he suffered a protracted impairment); *Wilson v. State*, 835 N.E.2d 1044, 1049 (Ind. Ct. App. 2005) (defendant admitted that officer's dislocated shoulder constituted a protracted loss or impairment of the function of a bodily member or organ, *i.e.*, the loss of use of the right arm), *trans. denied*; *Salone v. State*, 652 N.E.2d 552, 559 (Ind. Ct. App. 1995) (substantial evidence of probative value that T.F. suffered an injury that caused protracted loss or impairment of the function of her hand was found where burn to T.F.'s had prevented her from using it for fourteen to sixteen weeks), *trans. denied*.

[22] Here, the jury heard both parties' evidence on the extent of Officer Swain's injuries and found sufficient evidence that Officer Swain's injuries constituted a protracted impairment of his arm. Jackson's argument on appeal is a request that we reweigh the evidence or judge the credibility of witnesses, which we will not do. *Grundy v. State*, 38 N.E.3d 675, 682 (Ind. Ct. App. 2015), *trans. denied*. We find sufficient evidence that a protracted loss or impairment of the function of Jackson's arm existed to support his conviction for Level 3 felony aggravated battery.

### B. Intervening Cause

[23] Jackson also contends that there was insufficient evidence to support his conviction for Level 3 aggravated battery because there was ample evidence presented that Officer Swain's injuries were caused by the intervening cause of

Officer Swain having shot Jackson. *Appellant's Br.* at 24-25. Jackson argues that, once shot, he lost control of the van and swerved, which caused Officer Swain to be thrown from the van. Specifically, Jackson argues that it was not a foreseeable event that Officer Swain would jump onto the running board of the van and, unable to get Jackson to stop the van, start shooting at Jackson. *Id.*

[24]  During phase one of the trial, the jury was given Instruction 19, which was requested by Jackson but agreed to by both parties. Instruction 19 provided:

> An intervening cause is an independent force that breaks the causal connection between the actions of the defendant and the result. In order for an intervening cause to break the chain of criminal responsibility, the intervening cause must be so extraordinary and unforeseeable that it would be unfair to hold the defendant responsible for the actual result.

*Tr. Vol. III* at 78-79. In closing argument, defense counsel placed this instruction in context saying,

> So, kinda to wrap things up a little bit and let you get on your way, the bottom line is if Investigator Swain had not went Bruce Willis on us, and jumped on that van, and shot Mr. Jackson, not once, not twice, but five times, he wouldn't have got injured at all, so I'm asking you to think about that, and think about that as an intervening cause because while there are things that was in Mr. Jackson's control there was also things that were not in his control, the things Tabb did were not in his control, the things that Officer Swain did were not in his control, and that this is an intervening cause as far as the van goes . . . .

*Id.* at 109.

[25] For an intervening cause to break the chain of criminal responsibility, it must be so extraordinary that it would be unfair to hold the appellant responsible for the actual result. *Williams v. State*, 782 N.E.2d 1039, 1049 (Ind. Ct. App. 2003), *trans. denied*. "The foreseeability of an intervening cause presents a question of fact for the jury." *Cole v. State*, 69 N.E.3d 552, 558 (Ind. Ct. App. 2017), *trans. denied*. Here, the jury determined it was foreseeable that Jackson's failure to stop the van could result in injuries to Officer Swain. Again, Jackson's argument on appeal is a request that we reweigh the evidence or judge the credibility of witnesses, which we will not do. *Grundy*, 38 N.E.3d at 682.

[26] The evidence favorable to the verdict sufficiently proved that Officer Swain's actions did not break the chain of Jackson's criminal responsibility. Officer Howell was in uniform and driving a marked police car. Jackson defied Officer Howell's orders to exit the vehicle during a traffic stop and, instead, shifted the van into drive, and sped away at a high rate of speed while Officer Swain was standing on the running boards of the passenger side of the van. *Tr. Vol. II* at 162-63; *Tr. Vol. III* at 16-17. Jackson looked directly into Officer Swain's eyes and, therefore, knew Officer Swain was hanging onto the side of the van. *Tr. Vol. III* at 17. Even so, Jackson continued to accelerate despite Officer Swain's pleas for Jackson to stop. *Id*. at 17-18. Officer Swain even warned Jackson that he would shoot if Jackson did not stop the van, but Jackson kept driving "faster and faster." *Id*. In the absence of an intervening cause, we find the State presented sufficient evidence to support Jackson's conviction for Level 3 felony aggravated battery. *See Cole*, 69 N.E.3d at 558 (finding defendant's operation of

car, including a high-speed chase, proximately caused passenger's death by a police bullet).

[27] Because sufficient evidence existed to prove that Jackson acted knowingly and that the injury he inflicted created, without an intervening cause, a protracted injury to Officer Swain's arm, it follows that the State presented sufficient evidence for a reasonable jury to find beyond a reasonable doubt that Jackson committed Level 3 felony aggravated battery.

## II. Level 2 Felony Aiding in the Dealing of a Narcotic Drug

[28] Jackson also contends that the State presented insufficient evidence to support his conviction for Level 2 felony aiding, inducing, or causing another person to deal a narcotic drug. In reviewing sufficiency of the evidence, we examine only the probative evidence and reasonable inferences that support the verdict. *Griffin v. State*, 16 N.E.3d 997, 1003 (Ind. Ct. App. 2014). We do not assess witness credibility, nor do we reweigh the evidence. *Id*.

[29] To convict Jackson of Level 2 felony aiding, inducing, or causing another person to deal in a narcotic drug, the State had to prove that Jackson knowingly aided, induced, or caused Tabb to possess, with the intent to deliver, at least ten grams of heroin. Ind. Code § 35-48-4-1(a)(1), (e)(1); Ind. Code § 35-41-2-4. Jackson does not dispute that the police confiscated "adulterated heroin weighing 29.71 [grams]." *State's Ex*. 108; *Tr. Vol. II* at 16. Instead, he contends that he "was merely a bystander." *Appellant's Br*. at 25. In support, Jackson notes that Tabb was in control of the heroin and the van, and Tabb was the one

who had been under surveillance for about a year before the drug transactions of May 6, 2016. *Id.* Jackson argues,

> [He] drove the van only to relieve Mr. Tabb from the burden of driving. Mr. Tabb instructed where Mr. Jackson was to drive. He directed Mr. Jackson to Ms. Knight's home. Once there, Ms. Knight testified that she dealt with Mr. Tabb only. She stated that Mr. Jackson was not paying attention to her or what she was doing with Mr. Tabb but was talking on the telephone with his girlfriend and viewing eBay. The [MPD] Narcotics Unit had no previous knowledge of Mr. Jackson. He was merely in the wrong place at the wrong time.

*Id.* On appeal, Jackson contends that the State presented insufficient evidence to show that he aided, induced, or caused Tabb to commit the crime. *Id.*

[30] Under Indiana law there is no distinction between a principal and an accomplice with respect to criminal responsibility. *See Schroeder v. State*, 998 N.E.2d 279, 284 (Ind. Ct. App. 2013), *trans. denied*. A person "who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense." Ind. Code § 35-41-2-4. "Therefore, '[i]t is not necessary that the evidence show the accomplice personally participated in the commission of each element of the offense.'" *Griffin*, 16 N.E.3d at 1003 (quoting *Wilson v. State*, 455 N.E.2d 1120, 1123 (Ind. 1983)). "'[T]he acts of one accomplice are imputed to all.'" *Id.* (quoting *Collier v. State*, 470 N.E.2d 1340, 1342 (Ind. 1984)). Furthermore, the accomplice is criminally responsible for everything that "'follows incidentally in the execution of the common design, as one of its natural and probable consequences, even though it was not

intended as part of the original design or common plan.'" *Id*. (quoting *Johnson v. State*, 605 N.E.2d 762, 765 (Ind. Ct. App. 1992)).

[31] "'The particular facts and circumstances of each case must be considered in determining whether a person participated in the commission of an offense as an accomplice.'" *Id.* (quoting *Peterson v. State*, 699 N.E.2d 701, 706 (Ind. Ct. App. 1998)). For Jackson's conviction to stand, "'there must be evidence of [his] affirmative conduct, either in the form of acts or words, from which an inference of a common design or purpose to effect the commission of a crime may be reasonably drawn.'" *Id*. (quoting *Peterson*, 699 N.E.2d at 706). "Each participant must knowingly or intentionally associate himself with the criminal venture, participate in it, and try to make it succeed." *Id*. (quoting *Cohen v. State*, 714 N.E.2d 1168, 1177 (Ind. Ct. App. 1999), *trans. denied*). The State need not show that Jackson "'was a party to a preconceived scheme; it must merely demonstrate concerted action or participation in an illegal act.'" *Id*. at 1004 (quoting *Rainey v. State*, 572 N.E.2d 517, 518 (Ind. Ct. App. 1991)).

[32] Here, the evidence most favorable to the conviction showed that Jackson was friends with and in companionship with Neloms and Tabb, the latter having been suspected of dealing narcotics for more than a year. Jackson was in the van when Tabb stepped out of the van in Chicago and, in full view of Jackson, bought heroin. Jackson did not oppose the purchase; in fact, when Tabb reentered the van, Tabb shared some of the heroin with Jackson and Neloms. On the trip back from Chicago, Knight, understanding that heroin was scheduled to arrive in Muncie, called Tabb many times saying she wanted $100

worth of heroin. Jackson admitted to police that he answered one of the calls from Knight, told her they were on their way and, upon reaching Knight's residence, took Knight's money and handed her the heroin. *Tr. Vol. II* at 85-86, 145-46; *State's Ex.* 110 at 3:35-4:15, 15:00-16:00. At the close of the evidence, the trial court read Instruction 18, which informed the jury:

> Merely being present at the scene of a crime is not sufficient to prove that a person aided, induced or caused the crime. Failure to oppose the commission of the crime is also insufficient to prove aiding, inducing, or causing another to commit the crime. However, presence at the scene of the crime, failure to oppose the crime's commission, companionship with another engaged in criminal activity, a person's conduct before, during and after the occurrence of the crime are factors which may be considered in determining whether there was aiding, inducing or causing another to commit the crime.

*Tr. Vol. III* at 78.

[33] Considering the evidence presented and the instruction given, the jury rejected Jackson's arguments that he was a bystander or just merely in the wrong place at the wrong time. Jackson's argument on appeal is a request that we reweigh the evidence or judge the credibility of witnesses, which we will not do. *Grundy*, 38 N.E.3d at 682. Accordingly, the evidence was sufficient to sustain Jackson's conviction for Level 2 felony aiding, inducing, or causing another person to deal a narcotic drug.

Affirmed.

Bailey, J., and Pyle, J., concur.